## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| MARY KAY INC., | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | |
| | § | C.A. NO.: |
| JOHANNA  ANDREA  ROZO  a/k/a | § | |
| JOHANNA ANDREA ROZO GIRALDO, | § | DEMAND FOR JURY TRIAL |
| MAGENTA PRO INC., and JOHN DOES | § | |
| 1-10, | § | |
| | § | |
| Defendants. | § | |
| _____ | § | |

### COMPLAINT FOR DAMAGES, INJUNCTIVE, AND OTHER RELIEF FOR VIOLATION OF 15 U.S.C. § 1114, 15 U.S.C. § 1125(a), 15 U.S.C. § 1125(c), AND RELATED CLAIMS

Plaintiff Mary Kay Inc. ("Mary Kay") brings this action against Defendants Johanna Andrea Rozo a/k/a Johanna Andrea Rozo Giraldo, Magenta Pro Inc., and John Does 1-10 (collectively, "Defendants") for: (1) trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1114 and 15 U.S.C. § 1125; (2) unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A); (3) trademark dilution in violation of the Lanham Act, 15 U.S.C. § 1125(c); (4) trademark dilution in violation of Tex. Bus. & Com. Code § 16.103; (5) trademark infringement and unfair competition under Texas common law; and (6) tortious interference with existing contracts and business relationships.  These claims arise from Defendants' misappropriation of Mary Kay's trademarks in connection with Defendants' unlawful sale on the Internet of materially different and non-genuine products bearing Mary Kay's trademarks to unwitting customers.  In support of its complaint, Mary Kay alleges as follows:

## PARTIES

1.     Mary Kay is a corporation, organized under the laws of Delaware, with its principal place of business at 16251 Dallas Parkway, Addison, Texas 75001.

2.     Johanna Andrea Rozo a/k/a Johanna Andrea Rozo Giraldo ("Rozo") is a natural person who, upon information and belief, resides at 511 W. Wilken Way, Apt. 4, Anaheim CA 92802.   Upon information and belief, Rozo operates or assists in the operation of an online storefront on www.amazon.com ("Amazon") that is currently called "Sales4Ever" (the "Amazon Storefront").   The Amazon Storefront can be accessed at https://www.amazon.com/sp?seller= AKYJRC7T87W10.   Rozo does business throughout the United States through the Amazon Storefront.

3.     Magenta Pro Inc. is a corporation organized under the laws of California. According to the Articles of Incorporation and Statement of Information that were filed with the California Secretary of State, Magenta Pro Inc.'s principal place of business is located at 511 W. Wilken Way, Apt. 4, Anaheim CA 92802.  Upon information and belief, Magenta Pro Inc. operates or assists in the operation of the Amazon Storefront.  Magenta Pro Inc. does business throughout the United States through the Amazon Storefront.

4.     The Statement of Information filed for Magenta Pro Inc. lists Rozo as the Chief Executive Officer, agent for service of process, and single director of Magenta Pro Inc.   The Statement of Information does not list any other individuals as officers of Magenta Pro Inc. Accordingly, upon information and belief, Rozo is in control of, a principal of, and primarily responsible for Magenta Pro Inc. and its actions.

5.     Mary Kay asserts claims against Rozo in both her individual capacity as well as her capacity as a corporate officer of Magenta Pro Inc.

6.     Until it conducts discovery, Mary Kay cannot determine whether Rozo in her individual capacity, Magenta Pro Inc., or both operate the Amazon Storefront.

7.     Alternatively, upon information and belief, Rozo directs, controls, ratifies, participates in, or is the moving force behind the sales of infringing products bearing Mary Kay's trademarks by Magenta Pro Inc.  Accordingly, Rozo is personally liable for infringing activities of Magenta Pro Inc. without regard to piercing the corporate veil.

8.     Alternatively, on information and belief, Magenta Pro Inc. follows so few corporate formalities and is so dominated by Rozo that it is merely an alter ego of Rozo.  This is reflected, in part, by the fact that the publicly-listed principal business address for Magenta Pro Inc. is the same address as Rozo's home residence, an apartment unit.  Accordingly, Mary Kay is entitled to pierce the corporate veil of Magenta Pro Inc. and hold Rozo personally liable for the infringing activities of Magenta Pro Inc.

9.     Mary Kay believes that other individuals or entities may be responsible for the events and occurrences referred to herein or be otherwise interested in the outcome of the dispute.  The true names, involvement, and capacities, whether individual, corporate, associated, or otherwise of these individuals or entities are unknown to Mary Kay.  Therefore, Mary Kay sues these Defendants by the fictitious names John Does 1 through 10.  When the true names, involvement, and capacities of these parties are ascertained, Mary Kay will seek leave to amend this Complaint accordingly.  If Mary Kay does not identify any such parties, it will dismiss these Defendants from this action.

## JURISDICTION

10.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331, 28 U.S.C. § 1338, and 28 U.S.C. § 1367.  Mary Kay's federal claims are predicated on 15 U.S.C.

§ 1114 and 15 U.S.C. § 1125(a) and (c), and its claims arising under the laws of the State of Texas are substantially related to its federal claims such that they form part of the same case or controversy under Article III of the United States Constitution.

11.     This Court has personal jurisdiction over Defendants because they have expressly aimed tortious activities toward the State of Texas and established sufficient minimum contacts with Texas by, among other things, advertising and selling infringing products bearing Mary Kay's trademarks to consumers within Texas through multiple highly interactive commercial websites, through the regular course of business, with the knowledge that Mary Kay is located in Texas and is harmed in Texas as a result of Defendants' sales of infringing products to Texas residents. Defendants know that Mary Kay is located in Texas, among other reasons, because Defendants received cease-and-desist letters from Mary Kay that identified Mary Kay as a corporation located in Texas.   Mary Kay's claims arise out of Defendants' sales of infringing products bearing Mary Kay's trademarks to Texas residents through the regular course of business.

## VENUE

12.     Venue is properly founded in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Mary Kay's claims occurred within this judicial district, or in the alternative because a Defendant is subject to personal jurisdiction in this district.

## FACTUAL ALLEGATIONS
### Mary Kay and Its Trademarks

13.     Mary Kay is a global manufacturer and wholesale distributor of cosmetics, skin care products, toiletries, and other related products.  Mary Kay's products are sold in over thirty-five countries, including the United States, and the Mary Kay brand is recognized for its quality worldwide.

14.     Mary Kay uses a direct-sales business model designed to ensure that consumers only receive products that meet the company's high quality standards.  Mary Kay products are available to the public exclusively through Mary Kay Independent Beauty Consultants (hereafter, "Consultants"), who must enter into contracts with Mary Kay to be able to sell Mary Kay products.

15.     Mary Kay devotes a significant amount of time, energy, and resources to protecting the value of its brand, products, name, and reputation.  Through its contracts with Consultants, Mary Kay requires Consultants to provide customer services and follow various quality controls including requirements relating to product storage, handling, inspection, sales channel restrictions, and providing consultation and guidance on the safe and proper use of Mary Kay products (collectively, the "Consultant Obligations").   By selling its products exclusively through Consultants, Mary Kay is therefore able to ensure the satisfaction of consumers and maintain the integrity and reputation of the Mary Kay brand.  In the highly competitive cosmetics products market, product quality and customer service are a fundamental part of a consumer's decision to purchase a product.

16.     Mary Kay first began using the MARY KAY® trademark in 1963.  Since that time, Mary Kay has continuously used the MARY KAY® mark in commerce in connection with the sale of cosmetics products and other types of products.

17.     To promote and protect its intellectual property rights, Mary Kay has registered numerous trademarks with the United States Patent and Trademark Office.  These trademarks include, but are not limited to: MARY KAY® (U.S. Trademark Registration Nos. 0817516, 1070841, 1545983, 1842599, 2542184, 2559020, 3470956) and MK® (U.S. Trademark Registration Nos. 2559020, 3909669, 4509594, 4509597) (collectively, the "Mary Kay Trademarks").

18.    The registration for each of the Mary Kay Trademarks is valid, subsisting, and in full force and effect.  Pursuant to 15 U.S.C. § 1065, the Mary Kay Trademarks serve as conclusive evidence of Mary Kay's ownership of the marks and of its exclusive rights to use the marks in commerce and in connection with the sale and distribution of Mary Kay's products identified in the registrations.  *See* 15 U.S.C. § 1115(b).

19.    Mary Kay actively uses and markets the Mary Kay Trademarks in commerce.

20.    Due to the quality and exclusive distribution of Mary Kay's products, and because Mary Kay is recognized as the source of high quality products, the Mary Kay Trademarks have substantial value.

### Online Marketplaces and the Threat They Pose to
### Mary Kay's Quality Controls, Reputation, and Goodwill

21.    E-commerce retail sales have exploded over the past decade.  From 2009 to the end of 2019, the percentage of total retail sales in the United States that were completed through e-commerce channels rose from 3.8% to 11.4%. *E-Commerce Retail Sales as a Percent of Total Sales*, FEDERAL RESERVE BANK OF ST. LOUIS (February 19, 2020), https://fred.stlouisfed.org/series/ECOMPCTSA.

22.    In 2019, consumers spent $601.75 billion on e-commerce sales, a 14.9% increase from 2018.  The massive growth in e-commerce is being driven largely by sales on online marketplaces.  For example, in 2019, United States consumers spent $221.95 billion in e-commerce sales on Amazon, a 25.3% increase from 2018.  *See* Jessica Young, *U.S. ecommerce sales grow 14.9% in 2019*, DIGITAL COMMERCE 360 (February 19, 2020), https://www.digitalcommerce360.com/article/us-ecommerce-sales/.

23.     Although online marketplaces are becoming increasingly popular among consumers, they also greatly challenge a manufacturer's ability to control the quality and safety of its products.

24.     Unlike when purchasing products at brick-and-mortar stores or in interpersonal transactions, consumers who purchase products through online marketplaces cannot touch, inspect, or interact with products before purchasing them.  Instead, consumers must trust that the product they select over the Internet will be authentic and of the quality they expect and typically receive from the manufacturer.

25.     Online marketplaces have an exceedingly low barrier to entry, do not require sellers to be authorized sellers of the products they sell, and do not require sellers to disclose to consumers whether they are an authorized or unauthorized seller.  As a result, any person who is able to obtain a manufacturer's products through unauthorized diversion can sell the products on online marketplaces while concealing that they are an unauthorized seller who is outside of, and does not abide by, the manufacturer's controls.

26.     Online marketplaces are overrun by unauthorized sellers who have no relationship with (or obligations to) manufacturers who exercise quality controls over their products sold by authorized sellers.  It is unfortunately common for unauthorized sellers to sell diverted products on online marketplaces that are of lesser quality than products sold through manufacturers' authorized channels.  *See* Scott Cohn, *Greed Report: Your quest for savings could land you in the "gray market,"* CNBC, Sept. 8, 2016, https://www.cnbc.com/2016/09/08/greed-report-your-quest-for-savings-could-land-you-in-the-gray-market.html; Alexandra Berzon et al., *Amazon Has Ceded Control of Its Site. The Result: Thousands of Banned, Unsafe or Mislabeled Products*, THE WALL STREET JOURNAL, Aug. 23, 2019, https://www.wsj.com/articles/amazon-has-ceded-control-

of-its-site-the-result-thousands-of-banned-unsafe-or-mislabeled-products-11566564990.  It is also common for unauthorized sellers to sell products that are previously used—including products retrieved from dumpsters—as "new" on online marketplaces.  *See* Khadeeja Safdar et al., *You Might Be Buying Trash on Amazon—Literally*, THE WALL STREET JOURNAL, Dec. 18, 2019, https://www.wsj.com/articles/you-might-be-buying-trash-on-amazonliterally-11576599910.

27.     The business press has also reported extensively on how there is an "epidemic" of counterfeit products being sold on the online marketplaces that unauthorized sellers are exploiting because they know consumers trust marketplaces and think the products they are buying through the marketplaces are genuine.  *See* Spencer Soper, *Amazon Gets Real About Fakes*, Bloomberg, Nov. 28, 2016,  https://www.bloomberg.com/news/articles/2016-11-28/amazon-gets-real-about-fakes; Jay Greene, *How Amazon's quest for more, cheaper products has resulted in a flea markets of fakes*, THE WASHINGTON POST, Nov. 14, 2019, https://www.washingtonpost.com/technology/2019/11/14/how-amazons-quest-more-cheaper-products-has-resulted-flea-market-fakes/?arc404=true.

28.     The problem of sales of counterfeit and other poor-quality products on online marketplaces has become so serious that, in November 2019, the United States Senate Finance Committee issued a bipartisan report on the issue.  The Committee found that the rise of e-commerce has fundamentally changed how consumers shop for products and that, as e-commerce has grown, counterfeit goods and products that "violate a right holder's trademark or copyright" are being sold at an accelerating rate on e-commerce platforms.  The Committee concluded that these sales are a "significant threat" to rights holders' brands and to consumers, and that under current law it is up to rights holders to protect their intellectual property rights online.  *See* Senate Finance Committee, *The Fight Against Fakes: How Statutory and Regulatory Barriers Prevent*

*the   Sharing   of   Information   on   Counterfeits*,   Nov.   7,   2019,

https://www.finance.senate.gov/imo/media/doc/The%20Fight%20Against%20Fakes%20%20(20

19-11-07).pdf.

29.      In its 2018 and 2019 annual reports to its shareholders, Amazon also admitted that

third party sellers on its marketplace are selling products that are "counterfeit," "pirated," "stolen,"

or otherwise "materially different" from the product that was described to consumers. *See*

Amazon.com, Inc., Annual Report (Form 10-K), at 14 (Jan. 31, 2019), *available at*

https://www.sec.gov/Archives/edgar/data/1018724/000101872419000004/amzn-20181231x

10k.htm; Amazon.com, Inc., Annual Report (Form 10-K), at 14-15 (January 30, 2020), *available*

*at*   https://ir.aboutamazon.com/static-files/63a014ac-bd47-42ce-b548-022a90d96e9a.   Amazon

conceded that these actions are "violating the proprietary rights of others," and warned its investors

that it could be liable for "unlawful activities" of Amazon third-party sellers.

30.      Because manufacturers have no relationship with or control over unauthorized

sellers, manufacturers have no ability to exercise their quality controls over products sold by

unauthorized sellers or to ensure the products are safe and authentic.  A manufacturer's inability

to exercise control over the quality of its products presents serious risks to the health and safety of

consumers—particularly when, as here, some of a manufacturer's products are applied to

consumers' bodies.

31.      The structure, construction, and user interface of online marketplaces also pose

threats to a manufacturer's ability to maintain its goodwill, reputation, and brand integrity.

32.      When purchasing products on an online marketplace, customers are ordinarily not

informed whether a seller of a product is authorized by the manufacturer.  Additionally, the

interface design of many online marketplaces causes consumers to falsely believe that they are

always purchasing from the manufacturer when they purchase an online marketplace or, at minimum, from an authorized seller that is selling under the manufacturer's oversight and with the manufacturer's approval.   Consumers who purchase on Amazon are particularly likely to experience this confusion because, on Amazon, all sellers of a product are listed under a single product listing that states "By [name of brand]" immediately under the title of the product even though many products are sold on Amazon by unauthorized sellers that have no relationship with the manufacturer.

33.     For all of these reasons, a vast number of consumers purchase products on online marketplaces without recognizing that they purchased from an unauthorized seller that does not (and cannot) follow the manufacturer's quality controls.

34.     When a customer purchases on a marketplace and receives a product that is damaged, defective, expired, soon-to-expire, counterfeit, or of otherwise poor quality, the customer is much more likely to associate that frustration with the brand/manufacturer than the product seller.

35.     Online marketplaces also give disgruntled consumers a powerful and convenient forum to air their grievances about problem products: online product reviews.  Any consumer who is dissatisfied with a product he or she receives can post a review on the marketplace for all other consumers across the world to see.  These reviews, which are often permanently fixed, will often criticize the product manufacturer rather than the marketplace seller that sold the product.

36.     Online product reviews significantly impact a brand's reputation.  Survey results show that 82% of United States adults "sometimes" consult online reviews for information when they consider buying a new product online, and 40% "always" or "almost always" consult such

reviews.  Aaron Smith & Monica Anderson, Online reviews, PEW RESEARCH CENTER, Dec. 19, 2016, http://www.pewinternet.org/2016/12/19/online-reviews/.

37.    Studies and surveys consistently show that consumers place extraordinary trust in online product reviews.  For instance, one survey found that consumers are more than 10 times more likely to rely on consumer-generated product reviews than product descriptions written by brand owners.  Moms Place Trust in Other Consumers, EMARKETER, Feb. 10, 2010, https://www.emarketer.com/Article/Moms-Place-Trust-Other-Consumers/1007509.    Because consumers so heavily "rely on reviews when they're shopping online," the Federal Trade Commission has begun suing companies who post fake reviews of their products on online marketplaces.  Megan Henney, FTC cracking down on fake Amazon reviews, FOX BUSINESS, Feb. 28, 2019, https://www.foxbusiness.com/technology/ftc-cracking-down-on-fake-amazon-reviews (quoting a press release from the director of the FTC).

38.    Because of the reliance consumers place on online reviews, negative online reviews can be the death knell for a manufacturer's reputation and goodwill.

**Mary Kay's Reputation and Goodwill Have Been Harmed By Numerous Online Reviews Written By Consumers Who Purchased Poor Quality Products from Unauthorized Sellers Through Online Marketplaces**

39.    Consumers who purchase from unauthorized sellers on online marketplaces frequently receive poor-quality products and leave negative reviews on product listings.  These negative reviews injure consumer perceptions of a brand's quality and reputation, ultimately causing the brand to suffer damage to its goodwill and lost sales.

40.    Numerous consumers have written negative reviews of Mary Kay products being offered for sale on online marketplaces.  In these reviews, consumers have given Mary Kay

11

products low "ratings" and complained of receiving products that were expired, damaged, previously used, tampered with, counterfeit, or otherwise different from what was advertised.

41.     For example, on September 5, 2020, Amazon user "Cattywhitt" reported that, after she purchased what purported to be Mary Kay product, she received a product that "was a Mary Kay container but the contents smelled like a cheap alcohol based lotion." She added: "Should have read the reviews before purchasing. This is a scam."



42.     On July 4, 2020, Amazon user "LBB" complained that a Mary Kay product she purchased on Amazon "came damaged and leaking. It also has an odd odor like it's old."



43.     On June 6, 2020, Amazon user "Megan E" wrote that she had purchased on Amazon because "my normal mary Kay person stopped selling." She complained that the product she purchased "definitely didn't feel the same as what I previously had. Really runny and ended up throwing the bottle away."



44.     On May 14, 2020, Amazon user "Elizabeth" reported that a Mary Kay product she purchased on Amazon was expired.



45.    On May 9, 2020, an Amazon customer wrote that she had "used Mary Kay for 35 years," but a Mary Kay product she purchased on Amazon caused her to "get hives on my face and break out in red bumps under my eyes."



46.    On April 21, 2020, Amazon user "Char" complained that a Mary Kay product she purchased on Amazon "burned my eyes."  She added: "[n]ot sure what is in this product but once I applied I couldn't stop my eyes from tearing up.  Had to wash off immediately.  Never had this kind of reaction to a mascara before."



47.    On March 5, 2020, Amazon user "See Donna now" complained that a Mary Kay product she purchased on Amazon "was old, smelled off," and was the "crumbiest I've used !" She added: "I thought you were supposed to send new items!  I won't buy make up again.  Very uncomfortable to get crumbles in your eyes, burning too !"



48.    On February 22, 2020, Amazon user "Glori Jan Troporek" complained that, after she purchased a Mary Kay product on Amazon, she received a product that did not match the description on the outside of the box and which she believed was counterfeit. She wrote: "I have used Mary Kay for over 20 years and believe this seller is a fraud."



49.    On February 11, 2010, Amazon user "Claire" reported that a Mary Kay product she purchased on Amazon had to be "old" because "[t]his is no longer made by Mary Kay." She also complained that the product caused irritation on her face that resulted in numerous visits to the dermatologist, even though she "had used this product for years successfully before."



50.    On February 6, 2020, after purchasing what purported to be a Mary Kay product, Amazon user "RavenMichael" wrote: "Not sure what's in this bottle but it definitely wasn't Mary Kay product. Broke my skin out immediately. And Mary Kay never breaks me out. Waste of my money. Crap."



14

51.     On January 30, 2020, Amazon user "MusicCanhelpHeal" reported that, after she purchased a Mary Kay product on Amazon, she received a product that had previously been opened.  She warned: "[b]uyer beware."



52.     On December 30, 2019, Amazon user "Mary" reported that a Mary Kay product she purchased on Amazon was old and inconsistent with the quality she expects from Mary Kay, noting that she had "used this for years," but the product she received was "[d]ry and not as moist as I am use to."



53.     On November 8, 2019, Amazon user "Billy Ryals" complained that a Mary Kay product he purchased on Amazon was expired, explaining that "I sold Mary Kay and see the date is expired."



54.     On October 26, 2019, an Amazon user reported that a Mary Kay she purchased on Amazon came without packaging and was missing expiration date information.



55.     On October 7, 2019, Amazon user "Margaret Mawi" complained that a Mary Kay product she purchased on Amazon arrived "without an original box," appeared to be previously used, lacked a seal, and was "scratched all over."



56.     On October 3, 2019, Amazon user "Linda McMurtrey" reported that a Mary Kay product she purchased on Amazon "smells rancid, it burned my skin & had no expiration date."



57.     On August 17, 2019, Amazon user "Singh" complained that she purchased a Mary Kay product on Amazon that was open, did not have a seal, and appeared to be previously used.



58.     On July 27, 2019, Amazon user "MRBUBBLES" complained that he purchased a Mary Kay product on Amazon that was "fake," not sealed, and caused his eyes to burn.



59.     On May 30 2019, an Amazon Customer complained that a Mary Kay product she purchased on Amazon did not have a box, had its expiration date "taken off," and had a "yellow color" rather than "white cream."



60.     On May 25, 2019, Amazon user "Susan Ballard Harmon" complained that she received a Mary Kay product through Amazon that was "not in a Mary Kay packaging box" and "had a yellowing old look to it."



61.     On May 24, 2019, a Kindle Customer complained that she purchased Mary Kay lotion on Amazon that "has a severe smoke smell."  She suspected that she had received "damaged products they are trying to re-sell."



62.     On April 26, 2019, Amazon user "Lauren Cassimatis" reported that, after purchasing what purported to be a Mary Kay product on Amazon, she received a "fraud product." She explained that there "was no seal on the product and it was clearly NOT Mary Kay's eye makeup remover.  It is very oily and not the same."



63.     On March 19, 2019, an Amazon Customer complained that a Mary Kay product she purchased on Amazon felt like "it's been watered down" and "does not remove makeup like it should."  She explained that she had not experienced these issues when buying products from her friend who is a Consultant.



64.     On January 11, 2019, Amazon user "The W Collection" reported that, after purchasing what purported to be a Mary Kay product on Amazon, she received a product that "is NOT MK!!!"  She explained that the product "smells terrible," "immediately made my skin irritated," and had different print from a genuine Mary Kay product she compared it to.



65.     On December 15, 2018, Amazon user "Forest Billington" complained that he would not be "a Mary Kay customer any longer" because a Mary Kay product he received through Amazon caused him to believe that Mary Kay had changed the formula of the product.



66.     On November 5, 2018, an Amazon Customer complained that she purchased a Mary Kay product on Amazon that was eight years old and "broke my face out."  She admonished sellers to "[c]heck the dates on the product before you send it out."



67.     On October 7, 2018, Amazon user "Jayla" reported that, after purchasing what purported to be a Mary Kay product on Amazon, she received a product that was "fake."  She complained that the product "[s]mells like some $1 drug store cream plus it's all sticky on my face."

19



Jayla

⭐ **Fake**

October 7, 2018

**Verified Purchase**

Just got to using this. Because I had the real Mary Kay product left over. This was sold to me a while ago. I was stocking up. It's NOT REAL MARY KAY! FAKE! Smells like some $1 drug store cream plus it's all sticky on my face. I am so mad should of used this right away when I received it. I'm still going to call Amazon. This is awful. I'll prob break out from this stuff.



12 people found this helpful

68.     On September 29, 2018, Amazon user "Nadia" complained that she received a Mary Kay product through Amazon that had a "thank you" sticker covering up the product's expiration date.  When she removed the sticker, she discovered that the product had expired almost one year before she purchased it.



Nadia

⭐ **This stuff is expired!**

September 29, 2018

**Verified Purchase**

The expiration date in the product is October, 2017 and it was covered with a Thank you sticker! Almost a year old! Don't buy!

69.     The foregoing reviews are only a small sample of negative reviews of Mary Kay products that appear on the Amazon website.

70.     Amazon does not allow product reviews to identify the seller who sold the product that is the subject of the product review.  Given that Defendants are selling a high volume of products bearing the Mary Kay Trademarks on Amazon and are not subject to Mary Kay's quality controls, however, it is very likely that some of the foregoing negative reviews—and the many similar reviews of Mary Kay products that appear on the Amazon website—were written by customers who purchased products bearing the Mary Kay Trademarks from Defendants.

**Mary Kay Prohibits Sales on Online Marketplaces, Exercises Strict Quality Controls Over the Production and Distribution of Its Products, and Provides a Satisfaction Guarantee for Products Purchased from Consultants**

71.     Mary Kay maintains quality control over its products by allowing Mary Kay products to be sold to end-user consumers only by Consultants.  Mary Kay enforces the quality controls that Consultants are required to follow pursuant to their contracts with Mary Kay.

72.     Mary Kay strictly prohibits its products from being sold on all online marketplaces, including Amazon, in part because of the goodwill and consumer safety issues discussed above. When Mary Kay products are sold on online marketplaces, consumers purchase poor quality products without realizing they are purchasing from unauthorized sellers who are unaffiliated with Mary Kay and who are outside of, and do not abide by, Mary Kay's quality control and customer service requirements.

73.     Mary Kay also prohibits Consultants from selling products through certain other channels, including retail or service establishments and websites.  Mary Kay prohibits sales through these channels to encourage Consultants to display and sell products in interpersonal transactions where Consultants provide customers with vital information regarding Mary Kay products and their uses.  Through person-to-person interactions, Consultants are also able to provide explanation and guidance on how to safely and properly use Mary Kay products.

74.     Mary Kay's contracts with its Consultants expressly provide that the prohibition on selling Mary Kay products on online marketplaces and other retail websites survives the termination of the contracts.

75.     Through its contracts, Mary Kay also requires Consultants to follow quality controls relating to the handling, storage, and sale of Mary Kay products.  These quality controls allow Mary Kay to maintain the integrity and quality of its products, guarantee that consumers

receive undamaged, genuine goods, and ensure that consumers receive products that meet their specific needs.

76.     As an example, Mary Kay instructs Consultants to rotate their inventory of Mary Kay products and check the manufacture date to determine whether products are expired or soon-to-be expired.  To ensure that consumers receive the freshest possible product, Mary Kay imprints each of its products with a coding system that indicates the date when the product was manufactured.  Most Mary Kay products are produced to have a shelf life of three years from the date of manufacture, which is the standard for the cosmetic industry.  For products with a shelf life of less than three years, the expiration date is clearly indicated on the product packaging.

77.     To ensure that customers receive products of the quality they have come to expect from Mary Kay, Consultants are also prohibited from altering any Mary Kay product, packaging, label, or accompanying literature.  Consultants may sell Mary Kay products only in their original packaging and formulation to prevent customer confusion and erosion in the quality and value of Mary Kay products.

78.     The Consultant Obligations also require Consultants to provide personal services to customers concurrently with and after their sales of Mary Kay products, including providing advice, answering questions, and teaching customers how to use products.  Consultants have access to literature and other educational materials developed to advise customers on each product's purpose, features, and benefits.  Consultants are thus uniquely qualified to explain best practices for safe and optimal use of Mary Kay products, and Consultants are required to provide their contact information so that customers can contact Consultants with any questions about products or completed product purchases.  Consultants are also trained and instructed to present only truthful and accurate information about Mary Kay's products and services.

79. Mary Kay also prohibits Consultants from selling Mary Kay products to persons or entities who resell the products. Consultants are permitted to sell products only to end-user consumers, and only in quantities that are generally purchased by consumers for personal use. The purpose of these restrictions is to ensure that Mary Kay products are sold to consumers only by Consultants who follow Mary Kay's quality controls and over whom Mary Kay can exercise quality control.

80. Mary Kay provides a complete money-back satisfaction guarantee (the "Satisfaction Guarantee") to consumers who purchase Mary Kay products from Consultants. Under the Satisfaction Guarantee, a consumer can receive a product replacement, product exchange, or full refund if a consumer is not completely satisfied with any Mary Kay product that the consumer purchased from a Consultant. To receive benefits under the Satisfaction Guarantee, consumers must return the product at issue to the Consultant from whom the product was purchased. If the Consultant is no longer active, consumers must return their product to Mary Kay along with proof of purchase.

81. Mary Kay offers the Satisfaction Guarantee only for products that were sold by sellers who are subject to Mary Kay's quality controls and have agreed to follow its quality controls. Because non-Consultants are not subject to Mary Kay's quality controls and Mary Kay therefore cannot ensure the quality of products sold by non-Consultants, the Satisfaction Guarantee is not available for Mary Kay products purchased from any seller that is not a Consultant.

**Mary Kay's Discovery of Defendants' Sales of Mary Kay Products on the Internet**

82. Because the unauthorized sale of Mary Kay products over the Internet threatens the safety of consumers and the reputation and goodwill associated with the Mary Kay Trademarks, Mary Kay actively monitors the sale of Mary Kay products online.

83.     Through these efforts, Mary Kay discovered in June 2020 that high volumes of products bearing the Mary Kay Trademarks were being sold on Amazon through a storefront called "P A S S I O N F R U I T."

84.     Through investigation, Mary Kay discovered that Rozo and Magenta Pro Inc. were responsible, at least in part, for the operation of the "P A S S I O N F R U I T" storefront.  Upon information and belief, additional entities and/or individuals may also assist in the operation of the storefront.

85.     Neither Rozo nor Magenta Pro Inc. are, or have ever been, Consultants.

86.     On June 30, 2020, counsel for Mary Kay sent a cease-and-desist letter to Rozo and Magenta Pro Inc. via U.S. mail.  Mary Kay's letter explained that Defendants were infringing on the Mary Kay Trademarks and tortuously interfering with Mary Kay's contracts by purchasing products from Consultants, who are prohibited from selling products to non-Consultants who resell the products.   The letter also demanded that Defendants permanently cease selling products bearing the Mary Kay Trademarks and disclose every person and entity that provided Defendants with the products they had listed for sale.

87.     Mary Kay did not receive any response to its June 30 correspondence.  On July 14, 2020, however, Defendants changed the name of their storefront in an apparent effort to avoid Mary Kay's detection as they continued to sell products bearing the Mary Kay Trademarks on the Internet.   Defendants changed the name of their storefront from "P A S S I O N F R U I T" to "Sales4Ever."

88.     On August 25, 2020, after still not receiving any response to its June 30 letter, counsel for Mary Kay sent another cease-and-desist letter to Rozo and Magenta Pro Inc. via U.S. mail.  This letter repeated the contents of Mary Kay's June 30 letter and also enclosed a draft legal

complaint that was drafted to be filed in the United States District Court for the Northern District of Texas.

89.     As of the time of filing, Mary Kay has not received any response from Rozo or Magenta Pro Inc. to either its August 25 or June 30 letters.  Meanwhile, Defendants have continued to sell infringing products bearing the Mary Kay products through their Amazon Storefront without any abatement.

90.     Defendants have sold—and are continuing to sell—a high volume of infringing products bearing the Mary Kay Trademarks through their Amazon Storefront.   Monitoring software shows that, since May 2020, Defendants have sold more than 7,200 infringing products through their Amazon Storefront for revenue in excess of $182,000.

91.     As of the time of filing, Defendants' Amazon Storefront is still called "Sales4Ever." Although Defendants can change the name of their Amazon Storefront at will, every storefront on Amazon is assigned a "Merchant ID number" that does not change over time even if the formal "name" of a storefront is changed.  The Merchant ID number for Defendants' Amazon Storefront is AKYJRC7T87W10.  Even if Defendants change the name of their Amazon storefront again, their storefront can be accessed at the following link that includes the Merchant ID number for their storefront:

    a.   https://www.amazon.com/sp?seller=AKYJRC7T87W10

92.     On or about September 1, 2020, Defendants' Amazon Storefront began listing the operator of the storefront as "magenta pro inc" at "511 Wilken Way, Anaheim, California, 92802," confirming Defendants' involvement in the operation of the Amazon Storefront.

93.     Upon information and belief, through their Amazon Storefront, Defendants accept and fulfill orders from Texas residents for products bearing the Mary Kay Trademarks and cause

infringing products bearing the Mary Kay Trademarks to be shipped to persons located in Texas through the regular course of business.

94.     Defendants' disregard of Mary Kay's cease-and-desist letters and continued sale of non-genuine products despite being informed of their unlawful conduct demonstrates that they are acting intentionally, willfully, and maliciously.

### Defendants Are Selling Expired, Previously Used, and Damaged Products Through Their Amazon Storefront

95.     Customer reviews of Defendants' Amazon Storefront show that Defendants have sold products that were expired, previously used, tampered with, damaged, improperly packaged, or otherwise different from what customers had ordered.

96.     For example, on September 2, 2020, Amazon user "Alicia D. Carlson" complained that, after she purchased a Mary Kay product from Defendants' Amazon Storefront, she received a box that "was crushed and had pierced the outer casing of the mary kay product." She added: "Product was all smashed inside of box and was a mess. I have never received a package so badly damaged and the product damaged like this."



97.     On September 11, 2020, Amazon user "Boy George Fan!" complained that she purchased a product that was "out of date so couldn't use it !"

*" was out of date so couldn't use it ! "*
By Boy George Fan! on September 11, 2020.

98.     On September 6, 2020, Amazon user "Cathy" complained that she purchased a product from Defendants' Amazon Storefront that appeared to be expired. She wrote: "There's a date that says 2/21/20 but I don't know what that date means."

> ★★★☆☆   *"I'd like to know if this product is expired. There's a date on the box that says 2/21/20 but I don't know what that date means."*
> By Cathy on September 6, 2020.

99.   On September 7 2020, an Amazon customer complained that, after she purchased a product from Defendants' Amazon Storefront, she received a product that "was already used" and arrived in an open package.

> ★☆☆☆☆   *"Package came open and was already used"*
> By Amazon Customer on September 7, 2020.

100.   On August 28, 2020, Amazon user "Maria P." complained, in Spanish, that, she was not satisfied with a product she purchased from Defendants' Amazon Storefront because it did not arrive properly protected and was previously used.

> ★☆☆☆☆   *"No estoy conforme con el artículo ya que no llego debidamente protegido y aparentemente usado."*
> By Maria P. on August 28, 2020.

101.   On September 7, 2020, Amazon user "Lee" complained that, after she ordered a product from Defendants' Amazon Storefront, she received a product in a different color from what she had ordered.

> ★★★☆☆   *"I ordered Black and received Brown/Black"*
> By Lee on September 7, 2020.

102.   Defendants have not responded to any of the above reviews of their Amazon Storefront.

103.   These types of complaints about Defendants are typical of the complaints made about the products sold and the customer service provided by unauthorized sellers on online marketplaces.   A significant reason that Mary Kay allows its products to be sold only by Consultants that are subject to its quality controls and prohibits Consultants from selling products

on online marketplaces is to prevent customers from suffering experiences like those described in the above complaints about Defendants.

### Defendants Are Infringing the Mary Kay Trademarks by Selling Products Bearing the Mary Kay Trademarks That Are Not Subject To, Do Not Abide By, and Interfere With Mary Kay's Quality Control and Customer Service Requirements

104.    Defendants, without authorization from Mary Kay, have sold—and are currently selling—products bearing the Mary Kay Trademarks through their Amazon Storefront. Defendants may also be selling products through additional channels that Mary Kay has not yet discovered, and cannot discover until it is able to take discovery.

105.    The products sold by Defendants are not genuine Mary Kay products because they are not subject to, and interfere with, Mary Kay's quality control and customer service requirements that Consultants must follow.

106.    The negative customer reviews of Defendants' Amazon Storefront also show that Defendants are providing poor customer service and are selling products bearing the Mary Kay Trademarks that are expired, previously used, tampered with, damaged, improperly packaged, or otherwise different from what customers had ordered.  Given the high number of customers who have complained about the quality of products they purchased from Defendants, including products bearing the Mary Kay trademarks, it is also very likely that Defendants are responsible for some of the negative reviews of Mary Kay products that appear elsewhere on the Amazon marketplace.  *See supra* ¶¶ 41-68.  For these reasons, the products being sold by Defendants are also not genuine Mary Kay products because they do not abide by Mary Kay's quality control and customer service requirements that Consultants must follow.

107.    Through their unauthorized use of the Mary Kay Trademarks, Defendants have misled—and continue to mislead—consumers into believing they are purchasing products with the

same quality controls as genuine Mary Kay products.  In reality, however, the products sold by Defendants are materially different from genuine Mary Kay products because they are not subject to, do not abide by, and interfere with Mary Kay's quality control and customer service requirements that Consultants must follow.

**Defendants Are Infringing the Mary Kay Trademarks by Selling
Products Bearing The Mary Kay Trademarks That
Do Not Come With the Mary Kay Satisfaction Guarantee**

108.    As set forth above, Mary Kay products that are purchased from Consultants come with the Mary Kay Satisfaction Guarantee.  Mary Kay, however, does not provide the Satisfaction Guarantee for products purchased from any seller who is not a Consultant because Mary Kay cannot ensure the quality of products sold by sellers that are not subject to Mary Kay's quality controls.

109.    Because Defendants are not Consultants and, thus, are not subject to Mary Kay's quality control requirements, the products they sell bearing the Mary Kay Trademarks do not come with the Satisfaction Guarantee.

110.    Because the products Defendants sell do not come with the Satisfaction Guarantee, they are materially different from genuine Mary Kay products.

111.    The Satisfaction Guarantee is a material element of genuine Mary Kay products. Consumers considering whether to purchase Mary Kay products would find it relevant to their purchasing decision to know whether the product they are purchasing is covered by the Satisfaction Guarantee.  Consumers who purchase Mary Kay products with the Satisfaction Guarantee receive the peace of mind that they are receiving a high-quality product, that Mary Kay stands behind the product, and that they can get a refund, product replacement, or product exchange if they are dissatisfied with their product for any reason.

112.    Defendants' unauthorized sale of products bearing the Mary Kay Trademarks is likely to, and does, create customer confusion because customers who purchase products from Defendants believe they are purchasing genuine Mary Kay products that come with the Satisfaction Guarantee when, in fact, they are not.

**Defendants Are Tortiously Interfering With Mary Kay's Contracts With Consultants**

113.    As discussed, Mary Kay allows Mary Kay products to be sold to the public exclusively by Consultants.

114.    Mary Kay has entered into contracts with all of its Consultants that prohibit Consultants from selling Mary Kay products to persons or entities who resell the products. Consultants are permitted to sell products only to end-user consumers, and only in quantities that are generally purchased by consumers for personal use.

115.    Defendants have sold a high volume of products bearing the Mary Kay Trademarks on the Internet.  As Defendants are not Consultants and are thus not able to purchase products from Mary Kay, the only reasonable explanation for how Defendants have been able to obtain the volume the products they have resold is by purchasing the products from Consultants.

116.    By purchasing Mary Kay products from Consultants and then reselling them on the Internet, Defendants caused and induced Consultants to breach their contracts with Mary Kay.

117.    Defendants have known that Mary Kay's contracts with Consultants prohibit Consultants from selling Mary Kay products to third parties, such as Defendants, who are not ultimate consumers and who resell the products.

118.    Defendants have known of this prohibition, among other reasons, because Mary Kay informed Defendants of this prohibition in cease-and-desist letters it sent to Defendants on June 30, 2020 and August 25, 2020.

30

119.    Despite having knowledge of this prohibition, Defendants intentionally, knowingly, and willfully interfered with Mary Kay's contracts with its Consultants by actively seeking out Consultants and then encouraging, cajoling, and pressuring Consultants to breach their contracts by selling products to Defendants that Defendants resold on the Internet.

120.    Defendants had no legal right, privilege, or justification for their conduct. Defendants purchased Mary Kay products from Consultants—and in so doing, instigated a breach of the Consultants' contracts with Mary Kay—so that Defendants could resell the products as non-Consultants who are not subject to and do abide by Mary Kay's quality controls, thereby unlawfully infringing upon and materially damaging the value of the Mary Kay Trademarks.

**Mary Kay Has Suffered Substantial Harm as a Result of Defendants' Conduct**

121.    As a proximate result of Defendants' actions, Mary Kay has suffered, and will continue to suffer, significant monetary harm including, but not limited to, loss of sales, damage to the value of its intellectual property, harm to the goodwill associated with the Mary Kay brand, and damage to its existing and potential business relations.

122.    Defendants' conduct was and is knowing, intentional, willful, malicious, wanton, and contrary to law.

123.    Mary Kay is entitled to injunctive relief because Defendants will otherwise continue to unlawfully sell products bearing the Mary Kay Trademarks that are materially different from genuine Mary Kay products sold by Consultants and are not subject to, interfere with, and do abide by Mary Kay's quality controls, thereby compromising Mary Kay's quality controls. Defendants' ongoing illegal conduct has caused and will continue to cause irreparable harm to Mary Kay's reputation, goodwill, business relationships, intellectual property, and brand integrity.

## FIRST CAUSE OF ACTION
### Trademark Infringement
### 15 U.S.C. §§ 1114 and 1125(a)(1)(a)

124.   Mary Kay re-alleges and incorporates the allegations set forth in the foregoing paragraphs as if fully set forth herein.

125.   Mary Kay owns the Mary Kay Trademarks.

126.   Mary Kay has registered the Mary Kay Trademarks with the United States Patent and Trademark Office.

127.   The Mary Kay Trademarks are valid and subsisting trademarks in full force and effect.

128.   Defendants have willfully and knowingly used, and continue to use, the Mary Kay Trademarks in commerce for the purpose of selling products on the Internet without Mary Kay's consent.

129.   The products that Defendants sell bearing the Mary Kay Trademarks are not authorized for sale by Mary Kay.

130.   Defendants' use of the Mary Kay Trademarks in connection with their unauthorized sale of products is likely to cause confusion, cause mistake, or deceive consumers because it falsely suggests that the products offered for sale by Defendants are the same as genuine products legitimately bearing the Mary Kay Trademarks and originate from, or are sponsored by, authorized by, or otherwise connected with Mary Kay.

131.   Defendants' use of the Mary Kay Trademarks in connection with their unauthorized sale of products is likely to cause confusion, cause mistake, or deceive because it suggests that the products Defendants offer for sale are genuine Mary Kay products.

132.   The products sold by Defendants are not, in fact, genuine Mary Kay products.  The products sold by Defendants are materially different because, among other reasons, they are

ineligible for the Satisfaction Guarantee and are not subject to, do not abide by, and interfere with Mary Kay's quality control requirements that Consultants must follow.

133.    Defendants' unauthorized use of the Mary Kay Trademarks has materially damaged the value of the Mary Kay Trademarks, caused significant damage to Mary Kay's business relations, and infringed on the Mary Kay Trademarks.

134.    As a proximate result of Defendants' actions, Mary Kay has suffered, and will continue to suffer, great damage to its business, goodwill, reputation, and profits in an amount to be proven at trial.

135.    Mary Kay is entitled to recover its damages caused by Defendants' infringement of the Mary Kay Trademarks and disgorge Defendants' profits from their willfully infringing sales and unjust enrichment.

136.    Mary Kay is entitled to injunctive relief under 15 U.S.C. § 1116 because it has no adequate remedy at law for Defendants' infringement, and unless Defendants are permanently enjoined, Mary Kay will suffer irreparable harm.

137.    Mary Kay is entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith infringed on the Mary Kay Trademarks.

## SECOND CAUSE OF ACTION
### Unfair Competition
### 15 U.S.C. § 1125(a)(1)(A)

138.    Mary Kay re-alleges and incorporates the allegations set forth in the foregoing paragraphs as if fully set forth herein.

139.    Mary Kay owns the Mary Kay Trademarks.

33

140.    Mary Kay has registered the Mary Kay Trademarks with the United States Patent and Trademark Office.

141.    The Mary Kay Trademarks are valid and subsisting trademarks in full force and effect.

142.    Defendants have willfully and knowingly used, and continue to use, the Mary Kay Trademarks in commerce for the purpose of selling products on the Internet without Mary Kay's consent.

143.    The products that Defendants sell bearing the Mary Kay Trademarks are not authorized for sale by Mary Kay.

144.    Defendants' use of the Mary Kay Trademarks in connection with their unauthorized sale of products is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products offered for sale by Defendants are the same as genuine products legitimately bearing the Mary Kay Trademarks and originate from, or are sponsored by, authorized by, or otherwise connected with Mary Kay when they are not.

145.    Defendants' use of the Mary Kay Trademarks in connection with their sale of products is likely to cause confusion, cause mistake, or deceive because it suggests that the products Defendants offer for sale are genuine and authentic Mary Kay products when they are not.

146.    Defendants' unauthorized sale of products bearing the Mary Kay Trademarks and unauthorized use of the Mary Kay Trademarks in advertising infringes on the Mary Kay Trademarks.

147.    Defendants' unauthorized sale of products bearing the Mary Kay Trademarks and unauthorized use of the Mary Kay Trademarks in advertising has materially damaged the value of the Mary Kay Trademarks and has caused significant damages to Mary Kay's business relations.

148.    As a proximate result of Defendants' actions, Mary Kay has suffered, and will continue to suffer, great damage to its business, goodwill, reputation, and profits in an amount to be proven at trial.

149.    Mary Kay is entitled to recover its damages caused by Defendants' unfair competition and disgorge Defendants' profits from their unlawful sales and unjust enrichment.

150.    Mary Kay is entitled to injunctive relief under 15 U.S.C. § 1116 because it has no adequate remedy at law for Defendants' actions and, unless Defendants are permanently enjoined, Mary Kay will suffer irreparable harm.

151.    Mary Kay is entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith infringed on the Mary Kay Trademarks.

### THIRD CAUSE OF ACTION
**Trademark Dilution**
**15 U.S.C. § 1125(c)**

152.    Mary Kay re-alleges and incorporates the allegations set forth in the foregoing paragraphs as if fully set forth herein.

153.    Products bearing the MARY KAY® trademark have been sold to the public since 1963.  For 57 years, Mary Kay has been recognized by consumers as the source of high quality products bearing the MARY KAY® trademark, beginning with cosmetics products and expanding to many other types of products.

154.    The MARY KAY® trademark was first filed with the United States Patent and Trademark Office in 1964, and was registered in 1966.  Since that time, the MARY KAY® trademark has been filed and registered with respect to numerous categories of goods and services.

155.    Mary Kay is the owner of the MARY KAY® trademark, and has registered the trademark with the United States Patent and Trademark Office.

156.    The MARY KAY® trademark is valid, subsisting, and in full force and effect.

157.    Mary Kay has expended substantial time, effort, money, and resources advertising and promoting products and services under the MARY KAY® trademark.  As a result of Mary Kay's efforts, the MARY KAY® trademark is the means by which Mary Kay products and services are distinguished from others in the marketplace.

158.    Mary Kay markets, advertises, and sells products bearing the MARY KAY® trademark throughout the United States.

159.    Mary Kay has implemented legitimate and substantial quality controls that it requires all Consultants to follow to protect the Mary Kay name and brand.

160.    Consumers throughout the United States recognize and associate the Mary Kay name with quality.

161.    Because of the quality, durability, and dependability of Mary Kay products and Mary Kay's use of the MARY KAY® trademark, consumers trust the Mary Kay name and Mary Kay products.

162.    The MARY KAY® trademark is inherently distinctive, and as a result of Mary Kay's long and continuous use of the MARY KAY® trademark, it has acquired a secondary meaning associated by purchasers and the public with Mary Kay's products and services.

163.    Mary Kay is widely recognized by the general consuming public as the designated source of goods bearing the MARY KAY® trademark.

164.    For these reasons, since at least 1980, the MARY KAY® trademark has been famous, distinctive, and a widely recognized mark by the consuming public.

165.    After the MARY KAY® trademark became famous, beginning in or around 2020, Defendants have willfully used the MARY KAY® trademark in connection with the unauthorized and illegal sale of products.

166.    Because the products sold by Defendants do not come with the Satisfaction Guarantee and are not subject to and do not abide by Mary Kay's quality controls, consumers who purchase products from Defendants are more likely to receive a poor quality, damaged, expired, or defective product and have an unsatisfactory customer experience.  Indeed, customers have complained about receiving poor quality products from Defendants, and have also complained about Defendants' customer service.

167.    Consumers who receive poor quality products that do not come with the Satisfaction Guarantee or customer service provided by Consultants are likely to associate that negative experience with Mary Kay and the MARY KAY® trademark.  As a result, Defendants' unauthorized and willful use of the MARY KAY® trademark is tarnishing and diluting the value and distinctive quality of the MARY KAY® trademark.

168.    Defendants' unlawful actions have harmed the reputation and goodwill associated with the MARY KAY® trademark, and Mary Kay has suffered and will continue to suffer immediate and irreparable injury.  Further, Defendants' actions have harmed and will continue to harm consumers interested in purchasing genuine Mary Kay products.

169.     As a proximate result of Defendants' actions, Mary Kay has suffered, and will continue to suffer, great damage to its business, goodwill, reputation, and profits in an amount to be proven at trial.

170.     Mary Kay is entitled to recover its damages caused by Defendants' dilution of the MARY KAY® Trademark and disgorge Defendants' profits from their unlawful sales and unjust enrichment.

171.     Mary Kay is entitled to injunctive relief under 15 U.S.C. § 1116 because it has no adequate remedy at law for Defendants' infringement, and unless Defendants are permanently enjoined, Mary Kay will suffer irreparable harm.

172.     Mary Kay is entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith infringed on the Mary Kay Trademarks.

### FOURTH CAUSE OF ACTION
**Trademark Dilution**
**Tex. Bus. & Com. Code § 16.103**

173.     Mary Kay re-alleges and incorporates the allegations set forth in the foregoing paragraphs as if fully set forth herein.

174.     This claim arises under the laws of the State of Texas.

175.     Mary Kay is the owner of the MARY KAY® trademark, and has registered the trademark with the United States Patent and Trademark Office.

176.     The MARY KAY® trademark is valid, subsisting, and in full force and effect.

177.     Mary Kay has expended substantial time, effort, money, and resources advertising and promoting products and services under the MARY KAY® trademark.  As a result of Mary

Kay's efforts, the MARY KAY® trademark is the means by which Mary Kay products and services are distinguished from others in the marketplace.

178.   Mary Kay markets, advertises, and sells products bearing the MARY KAY® trademark throughout the United States, including in Texas.

179.   Mary Kay has implemented legitimate and substantial quality controls that it requires all Consultants to follow to protect the Mary Kay name and brand.

180.   Consumers throughout the United States, including in Texas, recognize and associate the Mary Kay name with quality.

181.   Because of the quality, durability, and dependability of Mary Kay products and Mary Kay's use of the MARY KAY® trademark, consumers trust the Mary Kay name and Mary Kay products.

182.   The MARY KAY® trademark is inherently distinctive, and as a result of Mary Kay's long and continuous use of the MARY KAY® trademark, it has acquired a secondary meaning associated by purchasers and the public with Mary Kay's products and services.

183.   Mary Kay is widely recognized by the general consuming public, including consumers in Texas, as the designated source of goods bearing the MARY KAY® trademark.

184.   For these reasons, since at least 1980, the MARY KAY® trademark has been famous, distinctive, and a widely recognized mark by the consuming public.

185.   After the MARY KAY® trademark became famous, beginning in or around 2020, Defendants have willfully used the MARY KAY® trademark in connection with the unauthorized and illegal sale of products.

186.   Because the products sold by Defendants do not come with the Satisfaction Guarantee and are not subject to and do not abide by Mary Kay's quality controls, consumers who

purchase products from Defendants are more likely to receive a poor quality, damaged, expired, or defective product and have an unsatisfactory customer experience. Indeed, customers have complained about receiving poor quality products from Defendants, and have also complained about Defendants' customer service.

187.   Consumers who receive poor quality products that do not come with the Satisfaction Guarantee or customer service provided by Consultants are likely to associate that negative experience with Mary Kay and the MARY KAY® trademark. As a result, Defendants' unauthorized and willful use of the MARY KAY® trademark is tarnishing and diluting the value and distinctive quality of the MARY KAY® trademark.

188.   Defendants' unlawful actions have harmed the reputation and goodwill associated with the MARY KAY® trademark, and Mary Kay has suffered and will continue to suffer immediate and irreparable injury. Further, Defendants' actions have harmed and will continue to harm consumers interested in purchasing genuine Mary Kay products.

189.   As a proximate result of Defendants' actions, Mary Kay has suffered, and will continue to suffer, great damage to its business, goodwill, reputation, and profits in an amount to be proven at trial.

190.   Because Defendants have willfully, intentionally, maliciously, and in bad faith infringed on the MARY KAY® trademark, this case qualifies for an award three times the amount of profits and damages and an award of attorneys' fees pursuant to Tex. Bus. & Com. Code §§ 16.103(c) and 16.104(c).

### FIFTH CAUSE OF ACTION
**Texas Common Law Trademark Infringement and Unfair Competition**

191.   Mary Kay re-alleges and incorporates the allegations set forth in the foregoing paragraphs as if fully set forth herein.

40

192.     This claim arises under the laws of the State of Texas.

193.     Mary Kay owns the Mary Kay Trademarks.

194.     Mary Kay has registered the Mary Kay Trademarks with the United States Patent and Trademark Office.

195.     The Mary Kay Trademarks are valid and subsisting trademarks in full force and effect.

196.     Defendants have willfully and knowingly used, and continue to use, the Mary Kay Trademarks in commerce for the purpose of selling products on the Internet without Mary Kay's consent.

197.     The products that Defendants sell bearing the Mary Kay Trademarks are not authorized for sale by Mary Kay.

198.     Defendants' use of the Mary Kay Trademarks in connection with their unauthorized sale of products is likely to cause confusion, cause mistake, or deceive consumers because it falsely suggests that the products offered for sale by Defendants are the same as genuine products legitimately bearing the Mary Kay Trademarks and originate from, or are sponsored by, authorized by, or otherwise connected with Mary Kay.

199.     Defendants' use of the Mary Kay Trademarks in connection with their unauthorized sale of products is likely to cause confusion, cause mistake, or deceive because it suggests that the products Defendants offer for sale are genuine Mary Kay products.

200.     The products sold by Defendants are not, in fact, genuine Mary Kay products.  The products sold by Defendants are materially different because, among other reasons, they are ineligible for the Satisfaction Guarantee and are not subject to, do not abide by, and interfere with Mary Kay's quality control requirements that Consultants must follow.

41

201.    Defendants' unauthorized use of the Mary Kay Trademarks has materially damaged the value of the Mary Kay Trademarks, caused significant damage to Mary Kay's business relations, and infringed on the Mary Kay Trademarks.

202.    As a proximate result of Defendants' actions, Mary Kay has suffered, and will continue to suffer, great damage to its business, goodwill, reputation, and profits in an amount to be proven at trial.

203.    Mary Kay is entitled to recover its damages caused by Defendants' infringement of the Mary Kay Trademarks and disgorge Defendants' profits from their willfully infringing sales and unjust enrichment.

204.    In harming Mary Kay, Defendants have acted with willful misconduct and actual malice.  Accordingly, Mary Kay is entitled to an award of punitive damages.

### SIXTH CAUSE OF ACTION
**Tortious Interference with Existing Contracts and Business Relationships**

205.    Mary Kay re-alleges and incorporates the allegations set forth in the foregoing paragraphs as if fully set forth herein.

206.    This claim arises under the common law of the State of Texas.

207.    Mary Kay allows Mary Kay products to be sold to the public exclusively by Consultants.

208.    Mary Kay has entered into contracts with all of its Consultants that prohibit Consultants from selling Mary Kay products to persons or entities who resell the products. Consultants are permitted to sell products only to end-user consumers, and only in quantities that are generally purchased by consumers for personal use.

209.    Defendants have sold a high volume of products bearing the Mary Kay Trademarks on the Internet.  As Defendants are not Consultants and are thus not able to purchase products from

Mary Kay, the only reasonable explanation for how Defendants have been able to obtain the volume of products they have resold is by purchasing the products from Consultants.

210.    By purchasing Mary Kay products from Consultants and then reselling them on the Internet, Defendants caused and induced Consultants to breach their contracts with Mary Kay.

211.    Defendants have known that Mary Kay's contracts with Consultants prohibit Consultants from selling Mary Kay products to third parties, such as Defendants, who are not ultimate consumers and who resell the products.

212.    Defendants have known of this prohibition, among other reasons, because Mary Kay informed Defendants of this prohibition in cease-and-desist letters it sent to Defendants on June 30, 2020 and August 25, 2020.

213.    Despite having knowledge of this prohibition, Defendants intentionally, knowingly, and willfully interfered with Mary Kay's contracts with its Consultants by actively seeking out Consultants and then encouraging, cajoling, and pressuring Consultants to breach their contracts by selling products to Defendants that Defendants resold on the Internet.

214.    Defendants had no legal right, privilege, or justification for their conduct. Defendants purchased Mary Kay products from Consultants—and in so doing, instigated a breach of the Consultants' contracts with Mary Kay—so that Defendants could resell the products as non-Consultants who are not subject to and do abide by Mary Kay's quality controls, thereby unlawfully infringing upon and materially damaging the value of the Mary Kay Trademarks.

215.    Mary Kay's contracts with its Consultants are a specific class of contract that Defendants are causing Consultants to breach when they purchase products from Consultants for resale.  Although Mary Kay does not yet know which specific Consultant(s) have breached their contracts with Mary Kay—and indeed cannot learn this information with certainty until it is able

to take discovery from Defendants in this action—Defendants know how they have obtained the products they resold and are on notice of the basis for Mary Kay's claim of tortious interference.

216.    Defendants are not parties to the contracts they caused Consultants to breach.

217.    As a proximate result of Defendants' actions, Mary Kay has suffered, and will continue to suffer, great damage to its business, sales, goodwill, reputation, and its existing business relations.

218.    In interfering with Mary Kay's existing contracts and business relationships with its Consultants, Defendants have acted with willful misconduct and actual malice.  Accordingly, Mary Kay is entitled to an award of punitive damages.

## CONDITIONS PRECEDENT

219.    All conditions precedent to Mary Kay's claims for relief, if any, have occurred or have been performed.

## REQUEST FOR ATTORNEYS' FEES

220.    Mary Kay is entitled to recover its attorneys' fees and costs for this action, pursuant to the federal and state law identified herein, and Mary Kay hereby seeks such recovery from Defendants of all its reasonable and necessary attorneys' fees and costs for prosecuting this action and obtaining the relief requested herein.

## JURY DEMAND

221.    Plaintiff demands a trial by jury on all claims and issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Mary Kay prays for relief and judgment as follows:

A.    Judgment in favor of Mary Kay and against Defendants in an amount to be determined at trial including, but not limited to, compensatory damages, statutory damages, treble

damages, restitution, disgorgement of profits, punitive damages, exemplary damages, and pre-judgment and post-judgment interest as permitted by law;

B.     That a permanent injunction be issued enjoining Defendants and any employees, agents, servants, officers, representatives, directors, attorneys, successors, affiliates, assigns, any and all other entities owned or controlled by Defendants, and all of those in active concert and participation with Defendants (the "Enjoined Parties") as follows:

       i)     Prohibiting the Enjoined Parties from advertising or selling, via the Internet or otherwise, all Mary Kay products,

       ii)     Prohibiting the Enjoined Parties from using any of the Mary Kay Trademarks in any manner, including advertising on the Internet,

       iii)     Prohibiting the Enjoined Parties from importing, exporting, manufacturing, producing, distributing, circulating, selling, offering to sell, advertising, promoting, or displaying any and all Mary Kay products as well as any products bearing any of the Mary Kay Trademarks,

       iv)     Prohibiting the Enjoined Parties from disposing of, destroying, altering, moving, removing, concealing, or tampering with any records related to any products sold by them which contain the Mary Kay Trademarks including: invoices, correspondence with vendors and distributors, bank records, account books, financial statements, purchase contracts, sales receipts, and any other records that would reflect the source of the products that Defendants have sold bearing these trademarks,

       v)     Requiring the Enjoined Parties to take all action to remove from the Enjoined Parties' websites any reference to any of Mary Kay's products, or any of the Mary Kay Trademarks,

       vi)     Requiring the Enjoined Parties to take all action, including but not limited to, requesting removal from the Internet search engines (such as Google, Yahoo!, and Bing), to remove from the Internet any of the Mary Kay Trademarks which associate Mary Kay's products or the Mary Kay Trademarks with the Enjoined Parties or the Enjoined Parties' websites, and

       vii)     Requiring the Enjoined Parties to take all action to remove the Mary Kay Trademarks from the Internet, including from the website www.amazon.com;

C.     An award of attorneys' fees, costs, and expenses; and

D.     Such other and further relief as the Court deems just, equitable and proper.

Respectfully submitted,

*/s/ Christopher J. Schwegmann*

Christopher J. Schwegmann
State Bar No. 24051315
cschwegmann@lynnllp.com
**LYNN PINKER HURST & SCHWEGMANN, LLP**
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
(214) 981-3800 – Telephone
(214) 981-3829 – Facsimile

Kent A. Britt
Ohio State Bar No. 0068182
kabritt@vorys.com
**VORYS, SATER, SEYMOUR AND PEASE LLP**
301 E 4th St, Suite 3500
Cincinnati, OH 45202
513-723-4488 – Telephone
513-852-7618 – Facsimile

**ATTORNEYS FOR PLAINTIFF MARY KAY INC.**